# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Douglas A. Kelley, in his capacity as the court-appointed Receiver of Thomas Joseph Petters; Petters Company Inc., aka PCI; Petters Group Worldwide, LLC; et al, | Court File No. _____ |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| vs. | |
| JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A., One Equity Partners LLC, Jacques A. Nasser, Lee M. Gardner, Charles F. Auster, James W. Koven, Rick A. Lazio,  J. Michael Pocock, William L. Flaherty and Ira H. Parker, | **COMPLAINT** |
| Defendants. | |

Plaintiff Douglas A. Kelley, (the "Plaintiff" or "Receiver"), in his capacity as the court-appointed receiver of the above captioned individual and entities, by and through his legal counsel, Fruth, Jamison & Elsass, PLLC, brings this Complaint against defendants JPMorgan Chase Bank, N.A., JPMorgan Chase & Co., One Equity Partners LLC, Jacques A. Nasser, Lee M. Gardner, Charles F. Auster, James W. Koven, Rick A. Lazio, J. Michael Pocock, William L. Flaherty and Ira H. Parker.  Together, defendants received more than $300 million from the multi-billion dollar Ponzi scheme that was operated and controlled by Thomas J. Petters ("Petters").  Defendants received over $240 million of these funds in connection with the sale of Polaroid Holding Company to Petters and his businesses.  Additionally, approximately $25 million of Petters' Ponzi

1

scheme proceeds were held in several investment accounts managed by JP Morgan.

These accounts were seized and liquidated by JP Morgan shortly after federal agents

raided Petters' offices and the Ponzi scheme collapsed.  Plaintiff, based on actual

knowledge and upon information and belief, states and alleges as follows:

<u>**PARTIES**</u>

1.      Plaintiff Douglas A. Kelley was appointed the Receiver of the Receivership

Estate on October 6, 2008, as amended in that certain Second Amended Order for Entry

of Preliminary Injunction, Appointment of Receiver, and Other Equitable Relief (the

"Receivership Order"), dated December 8, 2008, (Court File No. 08-CV-5348).  The

Receivership Order vests the Receiver with the full power of an equity Receiver and

requires the Receiver to "[t]ake exclusive immediate custody, control, and possession of

all property, assets, and estates belonging to or in the possession, custody, or under the

control of Defendants, wherever situated."  The Receiver's authority over the

Receivership Estate includes the power to "sue for, collect, receive, take into possession,

hold, liquidate or sell and manage all assets" of the Receivership Estate.

2.      Defendant JPMorgan Chase & Co., ("JPMorgan") is a corporation

organized under the laws of the state of New York and has its principal place of business

in New York, New York.

3.      Defendant JPMorgan Chase Bank N.A. ("JPMorgan Bank") is a national

banking association chartered under the laws of the United States and has its principal

place of business in New York, New York.  JPMorgan Bank is owned and controlled by

JPMorgan.

4.     Defendant One Equity Partners, LLC ("One Equity") is a Delaware limited liability company and has its principal place of business in New York, New York.  One Equity is owned and controlled by JPMorgan.  One Equity Partners and its affiliates, including, JPMorgan and some of the defendants listed below, received more than $240 million in Ponzi scheme proceeds when it sold its ownership stake in Polaroid Holding Company to Petters.

5.     Defendant Jacques A. Nasser ("Nasser") is a resident of the State of Michigan.  At all times relevant herein, Nasser was a Managing director of defendant One Equity and a former director and Chairman of the Board of Polaroid Holding Company.   Nasser received more than $12,800,000 in Ponzi scheme proceeds.

6.     Lee M. Gardner ("Gardner") is believed to be a resident of the State of Michigan.  At times relevant herein, Gardner was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.   Gardner received more than $200,000 in Ponzi scheme proceeds.

7.     Charles F. Auster ("Auster") is a resident of the State of New Jersey.  At times relevant herein, Auster was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.  Auster received more than $900,000 in Ponzi scheme proceeds.

8.     James W. Koven ("Koven") is a resident of the State of New York.  At times relevant herein, Koven was a Managing Director of defendant One Equity and a director of Polaroid Holding Company.  Koven received more than $50,000 in Ponzi scheme proceeds.

9.      Rick A. Lazio ("Lazio") is a resident of the State of New York.  At times relevant herein, Lazio was an Executive Vice President for defendant JPMorgan and a director of Polaroid Holding Company.[1]   Lazio received more than $500,000 in Ponzi scheme proceeds.

10.      J. Michael Pocock ("Pocock") is a resident of the State of California.  At times relevant herein, Pocock was a director, Chief Executive Officer and President of Polaroid Holding Company.  Pocock was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than $8,500,000 in Ponzi scheme proceeds.

11.      William L. Flaherty ("Flaherty") is a resident of the State of Massachusetts. At times relevant herein, Flaherty was an Executive Vice President and Chief Financial Officer of Polaroid Holding Company.  Flaherty was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than $5,340,000 in Ponzi scheme proceeds.

12.      Ira H. Parker ("Parker") is a resident of the State of Massachusetts.  At times relevant herein, Parker was the Chief Legal Officer for Polaroid Holding Company.[2]   Parker was actively involved in Polaroid and JPMC's negotiations and due diligence efforts relating to the merger of Polaroid and PCB and received more than

---

[1]   Defendants Nasser, Gardner, Auster, Koven and Lazio are referred to collectively herein as the "JPMC Affiliate Defendants."  Unless otherwise indicated by the context, defendants JPMorgan, JPMorgan Bank, One Equity and the JPMC Affiliate Defendants are referred to collectively herein as "JPMC."

[2]   Defendants Pocock, Flaherty and Parker are referred to collectively herein as the "Polaroid Control Defendants"

$1,560,000 in Ponzi scheme proceeds.

## PROCEDURAL BACKGROUND

13.     By an order issued on October 3, 2008, pursuant to 18 U.S.C. § 1345, the United States District Court of the District of Minnesota (the "District Court") placed, Petters and companies he owned and controlled, including Petters Company, Inc. ("PCI") and Petters Group Worldwide, LLC ("PGW"), into receivership in civil litigation commenced by the United States of America against, among others, Petters, PCI and PGW (Court File No. 08-CV-5348) (the "Receivership Action").  In that same order the District Court also ordered a freeze of all assets that were owned by Petters or any of the businesses he owned or controlled ("Freeze Order").

14.     By Order of the District Court in the Receivership Action dated October 6, 2008, as subsequently amended and restated on December 8, 2008 (the "Receivership Order"), the District Court appointed Douglas A. Kelley, Esq. ("Kelley") as equity receiver (the "Receiver") of any affiliates, subsidiaries, divisions, successors, or assigns owned 100% or controlled by Petters including PCI, PGW and numerous other Petters-related entities (collectively, the "Receivership Estate").

15.     As the court-appointed Receiver, Kelley serves as an agent of the United States District Court for the District of Minnesota and in that capacity possesses the right to exclusive custody, control and possession of the property, assets and estates of the Receivership Estate.

## INTRODUCTION

16.     The Receiver brings this action to recover certain transfers made to defendants by or on behalf of Petters.  The transfers received by defendants were derived from the proceeds of the massive Ponzi scheme orchestrated by Petters and others. JPMC's relationship with Petters began in 2001 and Petters held numerous investment accounts at JPMC from 2001 to 2008.   During that time he deposited more than $83 million of Ponzi scheme proceeds into the investment accounts.  In 2006, Petters issued a personal guaranty and pledged his investment accounts to JPMC to secure a credit line for PGW.

17.     The Ponzi scheme came to a crashing halt when federal agents raided Petters' offices on September 24, 2008.  At that time the investment accounts held approximately $25 million in cash and securities.  When JPMC learned about the raid it declared PGW's credit line in default and seized the investment accounts.  On September 30, 2008, JPMC began liquidating the assets held in those accounts.  JPMC claimed it was owed approximately $20 million on the PGW credit line.   The Receiver seeks to recover the amount of all assets that were held in the investment accounts immediately prior to September 30, 2008.

18.     JPMC knew or should have known that the money in Petters' investment accounts was derived from fraud.  In addition to knowledge JPMC acquired in connection with the management of Petters' investment accounts, in 2005, JPMC had the opportunity to conduct extensive due diligence on Petters and his companies in connection with Petters' acquisition of Polaroid Holding Company ("Polaroid" or "PHC") for $426

million.  Petters acquired Polaroid through PGW and its wholly-owned subsidiary,

Petters Consumer Brands, LLC ("PCB").  At the time of the Polaroid transaction, JPMC

controlled and was the majority owner of Polaroid through a private equity fund it owned

called One Equity Partners, LLC ("One Equity").  Of the $426 million that Petters paid

for Polaroid, One Equity and its affiliates, including JPMorgan received in excess of

$240 million.

19.    All of the money that Petters used to fund the purchase of Polaroid was

derived from the Ponzi scheme or Ponzi scheme investors.  In addition to the Ponzi-

scheme proceeds that JPMC received when One Equity sold its Polaroid ownership stake

to Petters, JPMC also received an estimated $40 million in fees and interest for its role as

financial advisor to Polaroid and as a result of a $185 million credit facility it provided to

Polaroid immediately after Petters acquired it.

20.    During the course of its due diligence, JPMC uncovered or should have

uncovered numerous red flags that should have put JPMC on notice of the Petters Ponzi

scheme.  However, the windfall that JPMC would earn on the transaction gave JPMC an

incentive to ignore red flags that would have revealed the massive Ponzi scheme that

Petters used to fund the Polaroid purchase.  These red flags included: (i) evasive emails

from the Petters team in response to due diligence inquiries; (ii) lack of tax returns and

audited financial statements for PCI, the central Ponzi scheme business that funded most

of the Polaroid acquisition; (iii) the fact that Petters' lenders were charging at least 15-

25% interest on loans to his businesses even though his businesses were supposedly

generating billions of dollars in revenue and hundreds of millions of dollars in profits;

(iv) not a single Petters-controlled business was profitable; (v) an investigation that

JPMC had performed as part of its due diligence revealed that Petters had eleven

judgments filed against him; and (vi) Petters had previously been convicted and jailed for

crimes involving dishonesty and theft.

21.     In light of these red flags, JPMC knew or should have known that the funds

Petters used to acquire Polaroid from JPMC were derived from fraud.  Indeed, JPMC

structured the Polaroid transaction in a way that suggests that it knew or suspected that

Petters' money was tainted.  JPMC indicated it was very wary of Petters' way of

financing.  As a result, JPMC insisted that before it would agree to any post-merger

financing for Polaroid, Petters would have to obtain a "firm commitment" letter –

meaning a letter from a major bank committing to provide all the funds necessary for the

transaction.  No legitimate bank would issue such a letter for Petters or his businesses so

JPMC came up with an alternative arrangement.  Instead of a firm commitment letter,

JPMC required that Petters obtain funding for the entire $426 million purchase price,

place all the money in two escrow accounts and complete the merger.  Only then would

JPMC provide financing for Polaroid.

22.     To comply with JPMC's requirement, Petters used Ponzi scheme proceeds

to fund the escrow accounts.  All of these funds flowed through Petters, PCI, PGW, PCB,

or another Petters-owned company called Petters Capital, LLC ("Petters Capital").  Those

proceeds were then used to pay Polaroid shareholders, including the $240 million that

went to One Equity and other JPMC affiliates and insiders.  In fact, the Polaroid

acquisition closed on April 27, 2005, and the JPMC financing (approximately $185

million initially) closed the next day.  Most of the money JPMC loaned was used immediately to pay down the Ponzi scheme investors who had provided some of the funds for the escrow accounts.  There is no reasonable explanation for this convoluted closing process except a desire by JPMC to distance itself from Petters' funding sources.

23.     The fact that JPMC knew or should have known about Petters' fraudulent scheme renders Petters' guaranty, his pledge of his investment accounts and the funds JPMC received from the Petters investment accounts avoidable and recoverable as fraudulent transfers because JPMC lacked good faith when it received these obligations and transfers.

24.     After the Ponzi scheme collapsed, numerous Petters-related entities filed for bankruptcy.  On October 11, 2008 (the "PCI Petition Date"), PGW and PCI, at the Receiver's direction, filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Minnesota, Court File No. 08-45257 and 08-45258 (the "PCI/PGW Bankruptcy").  Douglas A. Kelley was appointed the Chapter 11 Trustee for all Chapter 11 debtors in the PCI/PGW Bankruptcy matter (the "PCI/PGW Trustee").[3]

25.     On December 18, 2008 (the "Polaroid Petition Date"), Polaroid and other affiliated Polaroid debtors filed for protection under Chapter 11, of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota.  The Polaroid cases are jointly administered under Court File No. 08-46617 (the "Polaroid Bankruptcy").  On

---

[3] Douglas A. Kelley continues to act as Receiver for PCI and PGW for certain matters. *See e.g.*. Receivership Action Order dated December 20, 2010 (approving Receiver's motion to approve settlement of claims related to PCI and PGW).

September 1, 2009, the Polaroid debtors converted the case to one under Chapter 7 and John R. Stoebner was appointed as the Chapter 7 Trustee for the Polaroid Bankruptcy (the "Polaroid Trustee").[4]

26.     On June 12, 2009 (the "Petters Capital Petition Date"), Petters Capital, LLC filed for protection under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota, commencing the matter entitled *In re: Petters Capital, LLC*, Court File No. 09-43847 (the "Petters Capital Bankruptcy"). Randall L. Seaver was appointed as the Chapter 7 Trustee for the Petters Capital Bankruptcy (the "Petters Capital Trustee").

27.     The Polaroid transaction is the subject of complaints filed against defendants by the PCI/PGW, Polaroid and Petters Capital Trustees.  These complaints are captioned *Kelley, Trustee et. al., v. JPMorgan Chase & Co., et. al.*, 4:10-AP-4443 (Bankr. D. Minn. October 10, 2010), *Kelley, Trustee et. al., v. JPMorgan Chase & Co., et. al.*, 4:10-AP-4444 (Bankr. D. Minn. October 10, 2010), and *Kelley, Trustee et. al., v. JPMorgan Chase & Co., et. al.*, 4:10-AP-4445 (Bankr. D. Minn. October 10, 2010), and referred to collectively as the "JPMC Adversary Proceedings."

---

[4] On June 19, 2009, the Polaroid Trustee filed documents with the appropriate offices of the Secretary of State to change their corporate names to omit the term "Polaroid."  The debtor Polaroid  Holding Company is now "PBE Holding Company," the Debtor Polaroid Corporation is now "PBE Corporation."  This Complaint refers to the PBE debtors as Polaroid because that is how the cases continue to be captioned in the Bankruptcy Court.

28.     In this action, Plaintiff seeks to recover the value of the assets that JPMC seized from Petters' personal investment accounts after the Ponzi scheme collapsed,   In addition, Plaintiff seeks recovery of all Receivership Estate assets that were transferred to defendants as a result of the Polaroid acquisition, to the extent those transfers are not recovered in the JPMC Adversary Proceedings.

29.     Defendants are initial transferees of the fraudulent or otherwise avoidable transfers alleged in this Complaint, are entities or persons for whose benefit such transfers were made, or subsequent transferees of any initial transferee.

## JURISDICTION VENUE AND STANDING

30.     The Receiver has the capacity to commence this action pursuant to 28 U.S.C. § 754 and the Receivership Order.

31.     The Court has jurisdiction over this action as it is instituted by a federal equity receiver to execute his duties as set forth in the Receivership Order and pursuant to 18 U.S.C. § 1345.

32.     Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events and transfers giving rise to Plaintiff's claims occurred in Minnesota.

33.     Venue for this action is also proper in this district because this action is ancillary to the United States' proceedings pending in this district and the Receiver was appointed in this district.

## FACTUAL BACKGROUND

### THE PETTERS PONZI SCHEME

34.     The multi-billion dollar Petters Ponzi scheme is well documented and many of those involved have pled guilty to perpetrating various aspects of the fraud.  The scheme's central figure, Petters, was convicted by a jury and sentenced to 50 years in prison for his leading role in perpetrating this massive fraud.

35.     Petters has multiple felony convictions for crimes involving fraud and dishonesty.  He was convicted of forgery, larceny, and fraud in Colorado in 1989 and served time in jail for these crimes.  In 1990, in Minnesota Petters was charged with two counts of theft by check.  Petters pled guilty to one count and the other count was dismissed.  Petters also had numerous court judgments entered against him in civil matters over the years.

36.     Petters operated the Ponzi scheme through business organizations that he directly or indirectly owned and controlled from approximately 1993 through on or about the date of his arrest by federal agents on October 3, 2008.  Petters, through various entities that he controlled, including PCI, PGW, PCB and Petters Capital, laundered what is estimated to be an amount in excess of $40 billion.

37.     At various times during the course of the Ponzi scheme, Petters was assisted in the operation of the scheme by numerous individuals and conspirators (the "Associates").  Some of these Associates have pleaded guilty to various crimes relating to the Ponzi scheme.  Other Associates who participated in or aided and abetted the fraud may also face criminal or civil actions as the investigation of the Ponzi scheme continues.

12

38.     The scheme orchestrated by Petters and his Associates was a common species of fraud known as a Ponzi scheme.  Petters, through a multitude of entities and with the assistance of his Associates, would induce investors into financing the purchase of non-existent electronic equipment purportedly secured by fabricated purchase orders or otherwise provide financing for fabricated purposes.  Petters used funds invested by later investors to repay initial investors.

39.     Petters, through PCI, PGW, and a multitude of shell companies through which he operated, intended that the payments to early investors would induce ongoing, repeated, greater and more widespread investment in the Ponzi scheme and thereby further perpetrate and perpetuate the fraud.

40.     To obtain investors in the Ponzi scheme, Petters and his Associates portrayed PCI as a middleman that purchased consumer electronic goods or other goods from wholesalers and resold the merchandise to large, "big box" retailers such as Costco, Sam's Club and B.J.'s.

41.     Petters and his Associates prepared and utilized fabricated documents that were represented to investors to be equipment purchase orders and related documents. The fabricated documents included, but are not limited to, (1) purchase orders from PCI to suppliers purportedly ordering electronic goods, and (2) purchase orders from retailers to PCI purportedly ordering electronic goods for purchase from PCI.  The purchase orders and the related documents were entirely fictitious.

42.     PCI would show a "profit" on each transaction because PCI's fabricated purchase order from the big box retailer for the merchandise was always for an amount

greater than the amount of PCI's fabricated purchase order to its supplier for the same

nonexistent merchandise.  Petters and his Associates, through PCI, created fictitious

profits at will on each and every transaction by simply writing in the appropriate quantity

and price information on the two sets of purchase orders to "produce" the necessary

funds.

43.     Because the transactions described in the fictitious purchase orders in fact

did not exist, the only way PCI was able to transfer sufficient funds to investors was by

money obtained from other investors, in other words, through the operation, control and

management of the Ponzi scheme by Petters and his Associates.

44.     Over the years, Petters raised billions of dollars through his scheme.

Petters' Ponzi scheme relied on a few key feeder funds, the owners of which either knew

or should have known about the fraud.  These funds would raise money from

unsuspecting investors and then funnel the money to Petters in exchange for the false

profits that generated a consistent return on investment far above anything these funds

could achieve by investing in legitimate businesses.  Among the feeder funds that bought

notes from PCI were funds controlled by another defendant in the Ponzi scheme, Gregory

Bell ("Bell").  Bell controlled at least three funds known as the "Lancelot Funds."

45.     Bell and the Lancelot Funds raised approximately $2.6 billion dollars

between 2001 and August 2008.  Almost all of this money was used to invest in the Ponzi

scheme.  On October 7, 2009, Bell pled guilty to wire fraud in connection with his

transactions with Petters and was recently sentenced to five years in prison.

46.     Other significant Ponzi scheme feeder funds included Epsilon and a related

entity called Stafford Towne Limited (together, "Epsilon/Stafford Towne"), as well as a fund known as Metro Gem.  Metro Gem is one of a number of businesses owned and controlled by Frank E. Vennes, Jr. ("Vennes").  Vennes had extensive business dealings with Petters and earned millions of dollars in finder's fees for locating Ponzi scheme investors for Petters.  Vennes is a convicted felon and served time in prison in the late 1980s and early 1990s for money laundering and other crimes.

47.     Epsilon/Stafford Towne, Metro Gem and other feeder funds have been sued by Douglas A. Kelley, as Trustee for the PCI/PGW Bankruptcy Cases, to recover hundreds of millions of dollars in false profits they received from the Ponzi scheme.

48.     In the end, Petters proved to be an accomplished fraudster but a terrible businessman.  Neither PCI nor any other business that Petters owned actually made money.  Business losses among the Petters companies were routinely propped up by proceeds from the Ponzi scheme.

49.     Despite his many failed businesses, Petters and some of his Associates enjoyed a lavish lifestyle funded entirely by the massive Ponzi scheme.  Some of Petters' cronies and Ponzi scheme investors who were lucky or smart enough to get out early also made millions.  However, among the individuals and businesses that actually profited from the Ponzi scheme, few if any did better than JPMC.

## JPMC'S ASSIOICIATION WITH PETTERS

### Petters Begins His Relationship With JPMC

50.     JPMC's involvement with Petters and his giant Ponzi scheme is multifaceted and goes back many years.  Petters first opened an investment account with

JPMorgan in 2001.  On information and belief, Petters opened this investment account as a place to put phony profits generated by the Ponzi scheme.  Courtney Cavatoni ("Cavatoni") was the lead banker responsible for the overall relationship between Petters and JPMC.  Cavatoni spoke frequently with Petters and his Associates and met with Petters at least annually to review his investments.

51.     Over the years the relationship between JPMC and Petters blossomed. Petters opened additional investment accounts with Cavatoni at JPMC.  Between June 2002 and September 2007, more than $83 million flowed into these investment accounts.

52.     All of the money that flowed into these investment accounts was derived from the fraudulent Ponzi scheme.  This includes but is not limited to:  (1) $60 million from PCI; (2) $2.5 million from PGW; and (3) more than $11 million from other entities Petters controlled.

**JPMC Issues a Credit Line to PGW**

53.     On March 13, 2006, JPMorgan Bank issued PGW an $8 million credit line. This credit line was secured by Petters' personal guaranty dated March 16, 2006 (the Guaranty"), and by a collateral agreement that pledged two of his JPMC investment accounts.

54.     On May 2, 2006, PGW's credit line was increased to $20 million and the collateral agreement was amended to add an additional Petters investment account as collateral.

55.     On September 19, 2006, Cavatoni and a number of other JPMC bankers met with Petters and several PGW officers and employees at PGW's offices in

Minnetonka, Minnesota.  On information and belief, the purposes of this meeting were to further solidify the banking relationship between JPMC and Petters and obtain an increase in the PGW credit line.  This meeting included Mary Jeffries, whom Petters appointed as CEO of Polaroid, as well as Camille Chee-Awai, who was a principal of feeder fund Epsilon/Stafford Towne and was also acting as head of Petters Capital.  The meeting included a presentation about PGW and its purported successful businesses.  The presentation made numerous claims about Petters' business that were misleading and in many instances, patently false.  For instance, the presentation described Petters Capital as a "captive finance company" for which Petters had provided all the equity capital and that "had approximately $220 million in equity and $298 million of interest yielding assets."

56.     JPMC knew or should have known that the claims made about Petters' businesses were false.  Petters could not have provided $220 million in real equity to Petters Capital or any other entity because Petters had no source of capital other than the Ponzi scheme.  The "interest yielding assets" that were touted for Petters Capital were nothing more than IOU's that Petters Capital had received from Petters or his money losing businesses.  JPMC knew or should have known the truth about Petters Capital because, as discussed below, Petters Capital was instrumental in funding Petters' purchase of Polaroid from JPMC in 2005.

57.     One of the possible reasons Petters needed the PGW credit line extended was to purchase a 50% interest in Sun Country Airlines.  Petters accomplished this purchase in October 2006, using his investment accounts at JPMC and the PGW credit line in a Byzantine series of transfers that can only be explained as an attempt to launder

funds.  The transfers included eight separate transfers from PCI into Petters' personal

investment accounts totaling $17.5 million.  On October 31, 2006, Petters caused $15

million to be transferred to the PGW credit line.  Then $15 million was transferred from

the PGW credit line to another Petters-owned company called Thomas Petters, Inc.

("TPI").  On the same day, TPI transferred $15 million to another Petters-owned

company, Petters Aviation, LLC, which then purchased 50% of Sun Country Airlines that

same day.[5]  On November 2, 2006, Petters transferred $15 million back to the PGW

credit line.  Although the convoluted nature of these transactions strongly suggests an

attempt by Petters to launder funds and conceal their origin, JPMC never raised any

concerns about these transactions.

58.     On September 26, 2006, one week after the PGW presentation, JPMC

increased the PGW credit line to $40 million dollars.  This increase was apparently based

solely on the fact that Petters' personal investment accounts held at JPMC were securing

the loan.  To secure this increase, a new collateral agreement was prepared that added

another Petters investment account as well as his ownership interest in various hedge

funds held at JPMC.  However, this revised collateral agreement was not signed until

March 25, 2008.

59.     When JPMC learned about the September 24, 2008 raid of Petters' offices

by federal agents, JPMC declared the PGW credit line in default.  On or about September

---

[5]   The other 50% in Sun Country Airlines was purchased by White Box Advisors, a
Minneapolis based hedge fund.  In November 2007, Petters Aviation acquired the 50%
interest in Sun Country Airlines from White Box.  Like other Petters-controlled
businesses, Sun Country lost money and was propped up with Ponzi scheme proceeds.
Sun Country Airlines filed bankruptcy soon after federal agents raided Petters' offices.

30, 2008, JPMC seized and began to liquidate the approximately $25 million in securities then held in Petters' personal investment accounts.  At the time, JPMC claimed that PGW owed $19,641,000 on its credit line.

60.     As of October 6, 2008, JPMC had seized and liquidated $18.1 million of the assets in Petters' investment accounts.  By seizing and liquidating the investment account assets, JPMC reduced the balance on the PGW credit line to $1,500,000 from a pre-raid balance of $19,641,000.  Some of the asset sales by JPMC were not completed until after the October 3, 2008, Freeze Order was issued.

61.     By seizing and liquidating Petters' investment accounts after news of the federal raid, JPMC stepped ahead of the Ponzi scheme's victims and creditors to recover the nearly $20 million that PGW owed under the credit line.  JPMC knew or should have known that the money in Petters' investment accounts was derived from fraud.  Not only had Petters deposited more than $83 million into the investment accounts during a time when none of his businesses were profitable, JPMC, more than any other investor or creditor of Petters, had the opportunity to conduct extensive due diligence on Petters and his companies when it orchestrated the Polaroid transaction.

## JPMC AND THE POLAROID ACQUISITION

62.     During the same period that Petters was moving tens of millions of dollars of fraud proceeds through his JPMC investment accounts, JPMC engineered a transaction with Petters that would generate hundreds of millions of dollars for JPMC.  This transaction was acquisition of Polaroid Holding Company for $426 million in April 2005.  The acquisition was accomplished through a merger of Polaroid Holding Company and

PCB (the "Merger"), pursuant to a merger agreement among PGW, PCB and Polaroid Holding Company dated January 7, 2005.  Prior to the Merger, JPMC directly or indirectly controlled and was majority owner of Polaroid Holding Company.

63.     JPMC earned substantial fees and profits for the multiple roles it played in this transaction.  JPMC was the: (i) seller, as it was the majority owner and controlled Polaroid; (ii) financier, as it loaned more than $185 million dollars to Polaroid immediately following the Merger (but only after Petters funded the purchase of Polaroid with Ponzi scheme proceeds and caused Polaroid to grant JPMC a first secured lien on all of Polaroid's assets); (iii) syndicate manager, as it formed and managed a syndicate of banks that would participate in JPMC's loans to Polaroid; and (iv) financial advisor, as it served as investment advisor on the Merger, generating millions in fees that were paid at the closing out of Polaroid's cash.  Although its roles as lender and investment advisor generated as much as $40 million in fees and interest for JPMC, that figure is dwarfed by the profits JPMC earned by selling its Polaroid ownership stake to PCB.

64.     JPMorgan acquired its ownership stake in Polaroid by acquiring One Equity as part of its merger with Bank One in early 2004.  One Equity had purchased Polaroid's assets out of another bankruptcy in July 2002.  One Equity's purchase of Polaroid's assets was structured as a leveraged buyout ("LBO").  In a conventional LBO, an investor buys the stock of a company financed in part with the acquired company's cash and with debt that will be serviced by the acquired company's cash flow and secured by the acquired company's assets.

65.      When it purchased Polaroid's assets out of bankruptcy, One Equity formed

PHC.  PHC then issued to One Equity 580,000 shares of Series A Preferred Stock for $58

million and 20,000,000 shares of common stock for $2 million.  This stock represented a

65% holding in PHC, with 35% of the ownership granted to Polaroid's former

shareholders and creditors in the bankruptcy case.  By the end of 2004, One Equity had

caused PHC to use its cash to redeem all of One Equity's Series A Preferred Stock for

$58 million plus accrued interest, meaning that by the end of 2004, One Equity had

recouped nearly its entire investment in Polaroid.

66.      Soon after it bought Polaroid out of bankruptcy, One Equity installed one

of its managing directors, Nasser, as Polaroid's chairman.  One Equity, and by extension

JPMC, would remain the majority owner and in control of Polaroid until its sale to PCB

in 2005.

**Polaroid's Business Declines Rapidly After the One Equity LBO**

67.      After the One Equity LBO, Polaroid's revenues declined rapidly.

Polaroid's core business, instant film and cameras, was drying up due to the onset of

digital cameras and digital photography.  According to Polaroid's filings with the

Securities and Exchange Commission, Polaroid's revenue was $808 million in 2002,

$753 million in 2003, and $656 million in 2004.  As of December 2004, Polaroid

projected revenue for 2005 of only $515 million.  As the decline of Polaroid's core

business accelerated, One Equity searched for ways to generate additional revenue for

Polaroid.  This included efforts to license the Polaroid brand.

**PCI Acquires a License for the Polaroid Brand**

68.     On information and belief, on or about September 1, 2002, PCI entered into a license agreement with Polaroid, which was amended in December 2002 as the Amended and Restated License Agreement ("License Agreement"). The License Agreement allowed PCI to use the Polaroid brand on home DVD players, home cinema systems, televisions, and combination television/digital video disc players. In return, PCI was to pay Polaroid a royalty of 3% for each licensed device PCI sold with a minimum payment of between $1 million to $4 million per year between 2003 and 2006.

69.     In January 2003, Petters formed PCB as an independent operating company of PGW. The plan was for PCB to contract with overseas manufacturers to make portable DVD players and televisions under the Polaroid brand and then sell them to big box retailers such as Wal-mart, Target and Best Buy. Unlike PCI, PCB actually sold merchandise. However, PCB's margins were so low that its business could not be sustained without inflows of capital from the Ponzi scheme and its investors.

70.     In 2003, PCB generated $119 million in sales, but its gross margin was only 5.2% and it lost nearly $5.5 million. In 2004, PCB's sales grew to $282 million, but its gross margin shrank to just 2.1% and it lost nearly $15 million. To fund these losses, Petters looked to his usual Ponzi scheme investors.

71.     For instance, in 2004, PCB entered into a series of promissory notes with Thousand Lakes, LLC, one of the Ponzi scheme's special purpose entities set up by Petters to receive funding from Greg Bell and the Lancelot Funds. These notes carried an

annual interest rate of 18%.  As of December 31, 2004, PCB owed Thousand Lakes in excess of $42 million.

### Polaroid Threatens to Terminate the License Agreement

72.     At the same time losses were mounting at PCB, Polaroid began to harass Petters about the Polaroid license and began making threats to terminate it.  These threats culminated in a meeting between Petters and Nasser in New York City on September 2, 2004, at the Four Seasons Restaurant.  At this meeting, Nasser made clear that unless Petters agreed to purchase Polaroid, Polaroid could terminate the PCI license.

73.     Nasser had a strong motivation to convince Petters to buy Polaroid.  As a reward for becoming Chairman of Polaroid, Nasser had been issued more than one million shares of Polaroid stock.  On information and belief, Nasser and JPMC knew Polaroid's core business, instant film, was rapidly deteriorating and a quick sale to Petters would be their best hope for a big payday.

74.     For Petters, the purchase of Polaroid would eliminate Polaroid's ability to harass and threaten PCB over its license.  It would also provide an opportunity to help Petters launder some of the Ponzi scheme fraud proceeds by using them to acquire a legitimate business that – at least momentarily – generated positive cash flow.  Petters eventually agreed to purchase Polaroid for approximately $426 million and merge Polaroid with PCB.  The Merger was announced on January 7, 2005.

### Ponzi Scheme Funds Are Used to Fund the Polaroid Merger

75.     To increase its profit on the sale of Polaroid and to ensure the transaction would be completed, JPMC agreed to help finance the transaction.  The financing (the

"Credit Facility") consisted of a $125 million Fixed-Asset Term Loan (the "Term Loan")

and a $225 million asset-based revolving loan (the "Revolver").  Because the amount

loaned on the Revolver was based on Polaroid's receivables and inventory, only $60

million was advanced initially.

76.     Despite the fact that JPMC was going to provide more than $185 million in

financing, PCB was required to come up with the entire purchase price and place the

money into two escrow accounts prior to closing.  One escrow account would hold a $40

million breakup fee and the other would hold the balance of the purchase price.  The

escrow accounts were in the name of and controlled by PCB and PGW ("Petters Escrow

Accounts").

77.     To fund the Petters Escrow Accounts, Petters used money funneled from

the Ponzi scheme and its stable of feeder funds, including Lancelot (Bell), Metro Gem

(Vennes) and Epsilon/Stafford Towne.  A significant portion of this money was funneled

from PCI or its lenders through Petters Capital.  Petters Capital played a key role in

funding the Polaroid transaction, as at least $241 million of the money that was used to

fund the Petters Escrow Accounts was transferred through it.  Petters Capital had no

operating business and appears to have been formed as a conduit through which PCI

money or that of its lenders flowed into the Petters Escrow Accounts.

78.     All the money that Petters used to fund the Polaroid acquisition was

channeled into the Petters Escrow Accounts in a series of transactions that took place in

early 2005.  In summary, money flowed into the Petters Escrow Accounts as follows:

- $106 million was transferred from PCI into Petters Capital and then into the Petters Escrow Accounts.

- $11.1 million was transferred from PCI to PCB (n/k/a Polaroid) and then into the Petters Escrow Accounts.

- $7.9 million was transferred from PCI to the Petters Escrow Accounts.

- $100 million was transferred from Lancelot Funds to Petters Capital and then to the Petters Escrow Accounts.

- $125 million was transferred from Lancelot Funds to the Petters Escrow Accounts.

- $97 million was transferred from Epsilon/Stafford Town to PCB and then $50 million was transferred to the Petters Escrow Accounts (approximately $47 million was transferred back from PCB to Epsilon/Stafford Town).

- $35 million was transferred from Metro Gem to Petters Capital and then to the Petters Escrow Accounts.

**JPMC Structures the Polaroid Acquisition to Distance Itself from the Funding While Reaping Millions in Fees and Interest**

79.     JPMC appears to have structured the sale of Polaroid so that none of its money would be used to complete the merger and cash out the shareholders, including Polaroid's largest and controlling shareholder, One Equity.  JPMC also structured the transaction to ensure that it would generate significant investment banking fees and interest on loans that it would make *after* Petters and his business affiliates completed the funding and purchase of Polaroid.  For example, JPMC served as Polaroid's investment advisor for the Merger.  JPMC earned in excess of $4 million for this service, which was paid out of the closing proceeds, thereby reducing the cash that would be left in Polaroid after it merged with PCB.

25

80.     JPMC's multiple roles as seller, investment advisor to pre-Merger Polaroid, lender to post-Merger Polaroid, as well as personal investment advisor to Petters, created significant conflicts of interest.  Because of these conflicts of interest, Polaroid was forced to hire Lehman Brothers to give a fairness opinion to pre-Merger Polaroid.  On information and belief, Lehman Brothers was paid at least $1.7 million by Polaroid for this fairness opinion, further reducing the cash that would be left in Polaroid when it was acquired by Petters.[6]

81.     The Merger was extremely lucrative for JPMC.  Just two-and-a-half years after acquiring Polaroid's assets out of bankruptcy and after depleting Polaroid's cash to recoup its investment, JPMC orchestrated the sale of Polaroid for approximately $426 million.  JPMC received approximately $240 million of the proceeds from the sale of Polaroid to Petters.  This money represented substantial profit to JPMC because One Equity had already recouped nearly all the money it had invested when it bought Polaroid's assets out of bankruptcy two-and-a-half years earlier.

82.     The $240 million profit and $4 million in advisor fees was not the only money that JPMC made as a result of the Polaroid Merger.  On April 28, 2005, the day after the Merger closed and JPMC's Polaroid ownership had been transferred to PCB, JPMC closed on its $185 million Credit Facility.  This Credit Facility generated another

---

[6]   At the time of the Merger, Lehman Brothers and JPMC had a very close working relationship.  That relationship soured after Lehman Brothers' collapse.  Lehman Brothers recently filed a lawsuit against JPMC seeking to avoid in excess of $8 billion in transfers made to JPMC prior to Lehman Brothers' bankruptcy filing.

$4.5 million in commitment fees and as much as $40 million in interest for JPMC and its lending partners.

### JPMC and the Polaroid Control Defendants Conduct Due Diligence But Ignore Red Flags about Petters and His Fraudulent Businesses

83.     In its role as investment advisor to Polaroid and as a lender to the post-Merger Polaroid, JPMC, as well as the Polaroid Control Defendants, had an opportunity to conduct significant due diligence on Petters and his companies.  For example, JPMC hired a private investigation firm to investigate Petters and other employees of Petters' businesses.  This investigation revealed that Petters was named on 11 judgments.  However, JPMC either failed to or chose not to follow up on this report that raised significant questions about Petters.  Had it chose to follow-up on this red flag, JPMC would have discovered that Petters also had previously spent time in jail in Colorado arising out of fraud and forgery charges and had pled guilty to a theft charge in Minnesota.

84.     In addition to ignoring red flags raised about Petters' honesty and character, JPMC knew or should have known that the PCB/Polaroid business combination was unsustainable given the significant post-Merger debt that Polaroid would have to service and the fact that Polaroid's higher-margin instant film business was fading away.

85.     JPMC knew that that the combined company would begin its post-Merger life with at least $310 million in debt.  This included the $125 million Term Loan and approximately $60 million advanced on the $225 million Revolver.  It also included $125 million in subordinated debt ("sub debt") that JPMC required Petters to obtain.  Petters

obtained this sub debt from Petters Capital, which in turn obtained the money from PCI and its investors.  The interest rate on the JPMC $125 million Term Loan exceeded 11%, the Revolver charged about 7% interest, and the interest rate on the $125 million Petters Capital sub debt was set at 15%.  JPMC knew all this debt would generate interest expense for post-Merger Polaroid in excess of $35 million a year.  More importantly, JPMC knew that most of this debt would be used to pay off loans that Petters and his stable of Ponzi-scheme lenders used to fund the escrow accounts and very little would be left for working capital.  In fact, of the $310 million in initial financing, a total of $304 million would be used to pay off debt that Petters had obtained from Ponzi-scheme lenders like Lancelot Funds, Metro-Gem and Epsilon/Stanford Towne.  This would leave post-merger Polaroid with only about $25 million of cash for operations.

86.    But post-Merger Polaroid would need far more than $25 million of cash to survive.  Although the Polaroid business would generate some cash while the Polaroid instant film business was winding down, PCB's low margin consumer electronics business consumed huge amounts of cash.  JPMC knew that in 2004 PCB lost over $14 million on sales of $282 million and had fallen well short of its budgeted gross margin.

87.    Moreover, JPMC knew that to fund the huge increase in low-margin sales from $282 million to $600 million, PCB would need to borrow heavily to finance the required increase in inventory and receivables.  In 2004, when PCB generated $282 million in sales, PCB's operations used more than $90 million in cash and had to generate $98 million in cash through financing activities.  Assuming PCB would need to use at least that much cash if it doubled sales in 2005, JPMC knew or should have known that

the combined company would need to borrow in excess of $100 million for working capital, even if Polaroid's core business generated cash as projected.  This would mean that the combined company would have to service approximately $400 million in debt in its first year and even more going forward, unless it sold assets to pay off the debt.

88.     JPMC knew that the debt placed on post-merger Polaroid combined with the debt necessary to fund low-margin, cash-burning consumer electronics business would leave Polaroid insolvent no later than 2008 and likely much sooner absent more Ponzi scheme funding from Petters.  This put JPMC on notice that the sale of Polaroid and the Credit Facility could be set aside as fraudulent transfers if Polaroid were to become insolvent and file for bankruptcy.  In fact, one of the lenders that JPMC was soliciting to participate in the Polaroid facility warned JPMC that "it appears that certain **fraudulent conveyance issues** may arise out of the acquisition, merger and loan and security transactions contemplated herein."

89.     JPMC also had an opportunity to perform due diligence concerning PCI, which JPMC knew or should have known was a Ponzi scheme.  JPMC knew that PCI was the origin of at least $150 million of equity that Petters was supposedly going to contribute to the merger and knew or should have known that PCI was the source for the $125 million of sub debt that JPMC required as a condition for providing the Credit Facility.  Had JPMC inquired into PCI, it could have quickly learned not only that PCI lacked audited financial statements for most years, but also that it had not filed tax returns since 2002.

90.     The PCI business model was highly suspect.  Its business supposedly consisted of buying large amounts of "diverted" electronics and selling it to big box retailers such as Wal-Mart, Costco and Sam's Club.  However, JPMC knew or should have known that PCI was paying above-market interest rates to its lenders.  JPMC knew or should have known that a business that relied on selling to legendary margin-cutters like Wal-Mart, Costco and Sam's Club could not possibly operate a sustainable business if it had to pay interest rates from 15-24% or even higher to finance its inventory.

91.     When JPMC did bother to ask about PCI's lenders, it was given evasive and incomplete answers.  For instance in one email exchange, JPMC's attorneys asked for "all Petters debt documents."  This boilerplate due diligence request was not unusual and should have been complied with easily.  However, in response, David Baer ("Baer"), an in-house attorney at PGW, expressed "significant anxiety" over disclosing such documents in part because:

> these lenders have long and deep relationships with Petters.  We use them in many parts of our enterprise.  As of today they do NOT know that they will be paid off at closing.  When we tell them, there will be great pain for us.

JPMC knew or should have known that this response was evasive and inaccurate.  JPMC knew that this email was false and that the Ponzi scheme lenders such as Lancelot Funds and Metro Gem were aware they would be paid off after the merger and in fact JPMC received pay-off letters from each such lender.

92.     In addition to the patently false email response from Baer, JPMC also chose not to follow up on the very questionable answers it received to its rudimentary

questions about the origins of the $150 million in equity and $125 million in sub debt

that Petters was supposed to contribute to the Merger.  In an April, 21, 2005, email,

JPMC's counsel asked the CEO of PGW, Stuart Romenesko ("Romenesko"), about the

origins of the $150 million in equity.  JPMC's attorney also asked for additional clarity

on the identity of Lancelot, which had been identified as a lender to PCI and one of the

supposed sub-debt investors.

93.    Again, the response JPMC received was transparently evasive and

incomplete, but at a minimum it put JPMC squarely on notice that much of the funding

for the Polaroid acquisition was coming from PCI.  Romenesko told the attorney he

would get back to him about Lancelot.  With respect to the equity, Romenesko stated:

> the equity for this transaction came from Petters Group Worldwide (PGW)
> to Petters Consumer Brands (PCB) (since PCB is wholly owned by PGW)
> via an investment by Petters Company, Inc. (PCI and sister Company to
> PGW)   PCI is an entity owned 100% by Petters and which has substantial
> built up equity.  All of these entities (PGW, PCB and PCI) are controlled
> and owned by Petters and are set-up in this manner so that they operate as
> Independent Operating Companies as well as for tax purposes.  The $150
> million of equity put into this transaction is the result of built in equity in
> Petters Company, Inc.  There are no other individuals (other than for Tom
> Petters himself) that own the equity put into this transaction.

94.    Had JMPC properly followed up to verify this explanation, it would have

learned that PCI had no real equity, had not even filed current tax returns and had no

properly audited financial statements.  JPMC also did not inquire further into its

unanswered questions about Lancelot.  If it had, it would have discovered that the

Lancelot Funds were nearly 100% invested in the Petters Ponzi scheme.  Bell, Lancelot's

founder and long time Petters associate, has since pled guilty to wire fraud in connection

with his participation in the Petters Ponzi scheme and is currently serving a five-year prison sentence.

95.     JPMC's due diligence efforts exposed these and other red flags that placed or should have placed JPMC on notice that Petters' money was derived from fraud. JPMC's due diligence efforts were performed on its own behalf as well as Polaroid's behalf, as it was acting as Polaroid's investment advisor on the negotiations and due diligence leading up to the Merger.  The Polaroid Control Defendants were involved in the negotiations and due diligence efforts and were among the intended beneficiaries of all such efforts and are deemed to have all the facts and knowledge acquired during due diligence by their agent, JPMC.

### JPMC Earns Millions More in Fees and Interest for its Post-Merger Financing

96.     The day after the merger closed on April 27, 2005, JPMC closed on its $185 million Credit Facility for the now Petters-owned Polaroid and took a first lien position on all of the combined company's assets, which Petters had just paid $426 million to acquire.  The first lien position would eliminate most of JPMC's risk and allow it to reap another $4.5 million in commitment fees and over $15 million annually in interest.  The first lien position also gave JPMC enormous leverage, which it would use later to pressure Polaroid to pay off the JPMC loans early as post-Merger Polaroid teetered toward bankruptcy under the weight of its crippling debt.

97.     The $125 million Term Loan was used entirely to repay debt that Petters had used from PCI and PCI investors to fund the Petters Escrow Accounts, rather than for

working capital for the benefit of Polaroid.  On April 28, 2005, JPMC transferred $50 million to Epsilon/Stafford Towne, which had loaned approximately $100 million for the Polaroid transaction, and $75 million to Lancelot Investments, which had provided more than $200 million to the Petters Escrow Accounts.

98.     JPMC knew or should have known that the post-Merger Polaroid, burdened with staggering debt, a crumbling core business and the low margin PCB consumer electronics business, would not be able to survive long term.  To ensure that it would be repaid before Polaroid was forced into bankruptcy, JPMC began to pressure Petters to sell off Polaroid assets so it could pay off the JPMC loans early.  In response to this pressure, PCB repaid the 6-year Term Loan in a little over two years, largely through proceeds from the sale of Polaroid's real estate and intellectual property.  Despite being paid off four years early on the Term Loan, JPMC continued to pressure Polaroid to pay off the five-year Revolver, which it did in February 2008.  JPMC knew or should have known that Polaroid was losing money and did not have the cash available to pay off JPMC. JPMC also knew or should have known that to pay off the JPMC loans early, Polaroid would be forced to borrow more Ponzi scheme money from Petters and PCI.  Having been pressured to pay down the JPMC loans early, in 2007 Polaroid was forced to borrow $40 million of Ponzi scheme proceeds from PCI at 24% interest.

99.     Between JPMC's profit on the sale of Polaroid, its investment advisor fees and the interest and fees it earned on its Credit Facility, JPMC received in excess of $280 million as a result of the Polaroid transaction with Petters and PCB.

**Polaroid Collapses and Files Bankruptcy (Again) in 2008**

100.   Although the sale of Polaroid to Petters was highly lucrative for JPMC and the other defendants, it was disastrous for Polaroid and the creditors of Petters, PCI and PGW.

101.   Polaroid was never profitable after the merger and filed bankruptcy on December 18, 2008, approximately three and a half years after the Merger.

102.   On April 16, 2009, most of the assets of Polaroid were sold out of bankruptcy through an auction for approximately $86 million.

## DAMAGES

103.   Losses as a result of the Polaroid transaction exceed $300 million based on the difference between the $426 million Polaroid purchase price (not including the value of the contributed PCB consumer electronics business) and the approximately $86 million received for Polaroid when most of its assets were sold out of bankruptcy through an auction in 2009.

104.   Based on the foregoing facts and under the law, the Receiver is entitled to the return of all funds that were held in Petters' personal investment accounts immediately prior to September 30, 2008, the date JPMC began to liquidate those accounts and apply the proceeds to the outstanding balance of the PGW credit line. Plaintiff is entitled to the return of these funds because the transfer of these funds to JPMC constitutes fraudulent transfers under the Minnesota Uniform Fraudulent Transfer Act. The Guaranty (the "Obligation") and the collateral agreements (the "Pledges") that Petters entered into to secure the credit line are also avoidable as they arose in connection

with the fraudulent Ponzi scheme and were made or incurred in furtherance of the scheme and with the intent to hinder, delay and defraud Petters' creditors, and JPMC lacked good faith when it received the Obligations and Pledges.

105.   In addition, the Receiver is entitled to the return of all Receivership assets transferred to Defendants as payment for their Polaroid shares when the Merger closed on or about April 27, 2005, to the extent such transfers are not recovered in the JPMC Adversary Proceedings.   Defendants received $12.08 for each share of Polaroid stock they owned.   According to Polaroid's proxy statement filed with the Securities and Exchange Commission on March 29, 2005 (the "Proxy"), at the time of the Merger One Equity owned 18,745,000 shares of Polaroid.   One Equity affiliates, including JPMorgan and the JPMC Affiliate Defendants, owned 1,255,000 shares.   One Equity is liable for all the transfers made to its affiliates and therefore Plaintiff seeks to recover from JPMC transfers totaling $241,600,000 that JPMC and its affiliates received from the Petters Escrow Accounts.

106.   To the extent One Equity seeks to disclaim transfers received by its affiliates, and to the extent such transfers are not recovered in the Adversary Proceedings, the Receiver seeks recovery from the JPMC Affiliated Defendants as follows:

Jacques A. Nasser          $12,817,001

Lee M. Gardner             $201,334

Charles F. Auster          $906,000

James W. Koven             $50,334

Rick A. Lazio              $512,675

107.   The Receiver also seeks to recover all transfers received by the Polaroid

Control Defendants for their Polaroid stock, to the extent such transfers are not recovered

in the Adversary Proceedings, in the following amounts:

| | |
|---|---|
| J. Michael Pocock | $8,544,667 |
| William L. Flaherty | $5,340,447 |
| Ira H. Parker | $1,565,386 |

108.   Each of the above-described transfers (the "Transfers") are fraudulent

transfers under the Minnesota Uniform Fraudulent Transfer Act.

109.   To the extent that any of the recovery counts below may be inconsistent

with each other, they are to be treated as being pled in the alternative.

110.   The Receiver's investigation is on-going and the Receiver reserves the right

to amend this original Complaint to include:  (i) further information regarding the

Transfers, (ii) additional Transfers, (iii) modifications or revisions to defendants' names,

(iv) additional defendants, or (v) additional causes of action that may become known to

the Receiver at any time during this proceeding, through formal discovery or otherwise,

and for the additional causes of action to relate back to this original Complaint.

## COUNT I – FRAUDULENT TRANSFERS

### Actual Fraud – Minn. Stat. § 513.44(a)(1) and 513.47 or Other Governing Fraudulent Transfer Laws

111.   Plaintiff restates and realleges each of the allegations in the preceding

paragraphs as if fully set forth herein.

112.    The Obligation, Pledges and Transfers were made or incurred with the actual intent to hinder, delay, or defraud a creditor to which Petters was or became indebted on or after the date of the Transfers, Obligation and Pledges.

113.    The Obligation, Pledges and Transfers were made to or for the benefit of the defendants in furtherance of a fraudulent investment scheme.

114.    As a result of the forgoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

## COUNT II – FRAUDULENT TRANSFERS

### Constructive Fraud – Minn. Stat. §§ 513.44(a)(2)(i) and 513.47 or Other Governing Fraudulent Transfer Laws

115.    Plaintiff restates and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

116.    At all times material hereto, Petters, or PCI and PGW on Petters' behalf, were engaged in business or transactions, or were about to engage in business or transactions, for which the property remaining with Petters after the Transfers, Obligation and Pledges were effectuated constituted unreasonably small capital.

117.    Petters received less than a reasonably equivalent value in exchange for the Obligation, Pledges and Transfers.

118.    To the extent that any defendant is not an initial transferee of the Transfers, it is a subsequent transferee of the initial transferee of the Transfers, and upon information and belief, cannot satisfy its burden that it took the Transfers for value and in good faith, or is the entity or individual for whose benefit such Transfers were made.

119.    As a result of the forgoing, the Receiver is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

## COUNT III – FRAUDULENT TRANSFERS

### Constructive Fraud – Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47 or Other Governing Fraudulent Transfer Laws

120.    Plaintiff restates and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

121.    At all times material hereto and at the time of the Obligation, Pledges and Transfers, Petters, or PCI and PGW on Petters' behalf, intended to incur, believed or reasonably should have believed that they would incur, debts that would be beyond their ability to pay as the debts matured.

122.    Petters received less than a reasonably equivalent value in exchange for the Obligation, Pledges and the Transfers.

123.    As a result of the forgoing, Plaintiff is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

## COUNT IV – FRAUDULENT TRANSFERS

### Constructive Fraud – Minn. Stat. §§ 513.45(a) and 513.47 or Other Governing Fraudulent Transfer Laws

124. Plaintiff restates and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

125. At the time of the Transfers, Petters, PCI, and PGW were insolvent or, in the alternative, became insolvent as a result of the Obligation, Pledges and Transfers.

126. Petters received less than reasonably equivalent value in exchange for the Obligation, Pledges and Transfers.

127. As a result of the forgoing, Plaintiff is entitled to judgment pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states: (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

## COUNT V – UNJUST ENRICHMENT/EQUITABLE DISGORGEMENT

128.    Plaintiff restates and realleges each of the allegations in the preceding paragraphs as if fully set forth herein.

129.    At all times relevant hereto, all funds received by defendants were part and parcel of the Ponzi scheme and were derived from monies fraudulently obtained by Petters and PCI from other investors or participants in the Ponzi scheme.

130.    Defendants, as the recipients of fraudulently obtained proceeds of the Ponzi scheme have no legitimate claim to such monies.

131.    Defendants were unjustly enriched through their receipt of the fraudulently obtained monies to the detriment of other investors in PCI and the other entities used to perpetrate the Ponzi scheme, and in equity and good conscience must be required to repay the proceeds received.

132.    Defendants must, therefore, in equity be required to disgorge all proceeds received through the operation of the Ponzi scheme, so as to allow the Receiver to distribute in equity any such ill-gotten gains among all innocent investors of the Receivership Estate.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Receiver requests that the Court enter judgment in favor of Plaintiff and against defendants as follows:

1.    On Count 1 – Fraudulent Transfers (Actual Fraud), pursuant to Minn. Stat. §§ 513.44(a)(1) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding

the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

2.      On Count II – Fraudulent Transfers (Constructive Fraud), pursuant to Minn. Stat. §§ 513.44(a)(2)(i) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states:  (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings, and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

3.      On Count III – Fraudulent Transfers (Constructive Fraud), pursuant to Minn. Stat. §§ 513.44(a)(2)(ii) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other

states: (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering for the benefit of the Receivership the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

4.      On Count IV – Fraudulent Transfers (Constructive Fraud), pursuant to Minn. Stat. §§ 513.45(a) and 513.47, and if the Court should determine that this action is governed by the laws of other states, the fraudulent transfer laws of such other states (a) avoiding the Obligation and Pledges and avoiding and preserving the Transfers free and clear from any claimed interest of defendants, (b) directing that the Obligation, Pledges and Transfers be set aside, (c) recovering the Transfers or the value thereof from defendants, including any Transfers not recovered in the JPMC Adversary Proceedings and approximately $25 million in cash and securities that was held in Petters' investment accounts at JPMC immediately prior to September 30, 2008, for the benefit of the Receivership, and (d) recovering pre-judgment and post-judgment interest, attorneys' fees and costs from the defendants.

5.      On Count V – Unjust Enrichment/Equitable Disgorgement: declaring and ordering that the Receiver shall recover the Transfers to the extent not recovered in the JPMC Adversary Proceedings and any other monies received by the defendants, directly

or indirectly, from the fraud perpetrated through the Ponzi scheme, or the value thereof, for the benefit of the Receivership Estate; and that the defendants shall be liable to the Receivership Estate in an amount equal to all monies received and shall be required to disgorge the same for the equitable distribution to all investors of the Receivership Estate;

6.      On all Claims for Relief, establishment of a constructive trust over the proceeds of the Transfers in favor of the Receiver for the benefit of the Receivership Estate;

7.      Awarding the Receiver all applicable interest (including pre-judgment and post-judgment interest), attorneys' fees, costs and disbursements in this action; and

8.      Awarding such other relief as the Court may deem equitable under the circumstances.

FRUTH, JAMISON & ELSASS, PLLC


Dated:   December 29, 2010            By s/ Thomas E. Jamison
                                            Thomas E. Jamison (#220061)
                                            Douglas L. Elsass (#219241)
                                            K. Jon Breyer (#302259)
                                            Adam A. Gillette (#0328352)
                                         3902 IDS Center
                                         80 South Eighth Street
                                         Minneapolis, MN 55402
                                         Telephone:   (612) 344-9700

                                         ATTORNEYS FOR PLAINTIFF